IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

| | | |
|---|---|---|
| REMBRANDT ENTERPRISES, INC. § | Civil Action No. | |
|    Plaintiff, § | | |
| § | | |
| v. § | | |
| § | | |
| TECNO POULTRY EQUIPMENT S.P.A. § | COMPLAINT AND JURY DEMAND | |
| f/k/a TECNO POULTRY EQUIPMENT S.R.L. § | | |
| and TECNO POULTRY SYSTEMS, LLC § | | |
|    Defendants. § | | |

COMES NOW Rembrandt Enterprises, Inc., Plaintiff herein, and files this Complaint against Defendants, Tecno Poultry Equipment S.p.A. f/k/a Tecno Poultry Equipment S.R.L. and Tecno Poultry Systems, LLC, and, in support thereof, respectfully shows the Court as follows:

### THE PARTIES

1. Plaintiff Rembrandt Enterprises, Inc. is a corporation organized in the State of Iowa with its principal place of business at 1419 480th Street, Rembrandt, Iowa 50576.

2. Defendant Tecno Poultry Equipment S.p.A. f/k/a Tecno Poultry Equipment S.R.L. ("Tecno SpA") is a foreign business entity organized under the laws of Italy, with its principal place of business at Via Salvo d'Acqusisto, 11 Ronchi di Villafranca Padovana Padova 35010, Italy. Defendant Tecno SpA may be served with process pursuant to the Hague Convention.

3. Defendant Tecno Poultry Systems, LLC ("Tecno LLC") is a limited liability company organized in the Commonwealth of Pennsylvania with a principal place of business in Lancaster, Pennsylvania. Defendant Tecno LLC may be served with process at 2025 Single Tree Lane, Lancaster, Pennsylvania 17602.

## JURISDICTION AND VENUE

4. Jurisdiction is proper pursuant to 28 U.S.C. § 1332(a)(1) because this action arises from an actual dispute or controversy in which the parties are citizens of different states and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

5. The Parties have contractually agreed to personal and subject matter jurisdiction in the federal and/or state courts of Iowa.

6. Venue is proper in the Northern District of Iowa pursuant to 28 U.S.C. § 1391(b)(2) because the Northern District of Iowa is where the substantial part of the subject of this action is located.

7. The Parties have contractually agreed to venue of this dispute in the federal and/or state courts of Iowa.

## FACTS

8. Plaintiff owns and operates egg farms that produce, process, and distribute liquid, powder, and other egg-based food products for food processing and manufacturing companies. Plaintiff has multiple locations throughout the Midwest portion of the United States.

9. Defendant Tecno LLC is a company that is a part of the farm support services industry. Defendant Tecno LLC acts as an authorized dealer/distributor for Defendant Tecno SpA.

10. Defendant Tecno SpA, headquartered in Ronchi Di Villafranca, Italy, designs, manufactures, and supplies poultry housing and related products, including egg collection equipment and trolley feeding systems.

11. On or about December 19, 2006, Plaintiff contracted with Defendant Tecno SpA to design, fabricate, install, and supervise the installation of poultry caging systems on its egg farm in Rembrandt, Iowa (the "Premises").

12. The subject building was constructed in 2007. The building is constructed so that the primary structural framing elements are exposed to the elements while insulation panels are installed on the interior side of the structure to control the temperatures inside the building.

13. The caging systems inside the buildings were designed and supplied by Defendant Tecno SpA and Defendant Tecno LLC. The installation was performed by an approved Defendant Tecno LLC installer. Plaintiff also contracted with Defendant Tecno SpA to supervise the installation of the caging system.

14. There is one (1) building on the Premises called a Super Barn. The Super Barn has a dividing wall which runs down the axial length of the structure which splits the Super Barn into two (2) separate barns. The south section of the Super Barn is called Barn 17 and the north section is Barn 18. Each barn has eight (8) rows of the poultry caging system. The caging system runs the length of the building. The caging system is two (2) stories tall with a catwalk between the lower and upper caging system. The catwalk connects to each row of cages and also, on the exterior rows, the catwalk extends to the walls of the buildings. The rows are numbered from "1" to "8" with Row 1 of Barn 17 being the first row from the exterior wall. There is a feeder system which runs on rails along both the top and bottom stories to distribute feed to the chickens. There is a Manure Tower at one end of the caging system (on the west end) and an Egg Tower at the other end (the east end) of the caging system.

15. As the outside air and sun would heat and cool the building, and as the wind blew, this outer shell would expand, contract, and rock, transferring those displacements and corresponding forces through the catwalk and to the rack system. The slotted connections at the catwalk appears to be intended to allow for those displacements to occur while transferring minor

lateral loads into the racks, without movement of the racks. The racks did not brace the building, and the building did not support the cages. They were independent of each other.

16. A critical component of the rack system is the knuckle bracket connecting the catwalk and the upper and lower stanchions.

17. This knuckle is intended to have two screws at the top, two screws at the bottom, and two bolts along the spine to transfer forces from the upper rack to the lower rack. With the fasteners in place, the knuckle bracket is restrained by the entire row assembly and will resist enough in-plane loading from the normal functioning of the system and building.

18. The as-built conditions did not have any of the fasteners at the top, and it was evident they were never installed, and many of the bottom fasteners were not in place, and it was evident that the bottom fasteners were likewise never installed.

19. Furthermore, the feeder rail sections were spliced together to form the full 425' of rail. These splice joints consist of a cold-formed steel channel that is slid inside the two rail pieces and screwed into place. These splices are intended to occur close to a vertical support so that only shear is transferred across the splice. However, throughout the site, several of these splices occurred in the midspan between two stanchions. When the joint occurs within the middle of the span, a moment is required to be transferred across the splice. The moment had to create couple forces through shear in the screws. As the feeder trolley would travel across these splices, these forces would deflect down and out which created additional eccentricities and unintended horizontal loading on the rack system. The repeated eccentric loading created by the improper splice caused screws throughout the system to become loose and, in many cases, fall out or shear off.

20. The instability of the splice-rails allows the Feeders to create larger eccentric loads as the Feeder will not stay plumb to the caging system. Also, as the Feeders put weak-axis load on the rails, it creates a larger eccentric load to the racks horizontally.

21. The in-plane loads created by the building and from the feeder trolley on loose rails along with missing screws at the critical knuckle bracket created excessive, cyclic forces on the connection and thus triggered the February 14, 2020 failure and catastrophic collapse of the poultry caging system in Barn 17 that extended to Barn 18.

22. One of Plaintiff's employees was trapped in the barn after the collapse and subsequently died.

23. The reason it took so long for the failure to occur was the inherent as-constructed instabilities within the caging system, the on-going use of the caging system, and the weather. These conditions did not occur overnight and were slowly building up over time. All of these things added up led to the ultimate failure of the poultry caging system.

### CAUSES OF ACTION

### Count 1 – Strict Products Liability

24. Plaintiff incorporates by reference paragraphs 1 through 19 above as if each were fully set forth at length herein.

25. The collapse of the poultry caging system and the damages sustained by Plaintiff as a result of the collapse were caused by defects in the products sold by Defendant Tecno LLC and Defendant Tecno SpA respectively, for one or more of the following reasons:

(a) The critical connection of the framing system is the bracket that connects the upper and lower caging system together. The bracket requires two (2) fasteners on the top and two (2) at the bottom to connect the vertical channels. No fasteners were ever used at the top and some of the fasteners were missing at the bottom making this connection inadequate and unstable;

(b)  Because of the lack of fasteners, the system could not handle minor loads without causing distress to the caging system;

(c)  The installation was incorrect and allowed the lateral forces to be exerted on the rack system;

(d)  The most critical bay is the 1st row of cages towards the exterior of the building. The catwalks are designed to move with building movements and thermal changes without putting forces on the caging system;

(e)  The splice joints on the feeder rail of the caging system are intended to occur close to a vertical support so that only shear is transferred across the splice. However, throughout the caging system, several of these splices occurred in the midspan between two stanchions. As the feeder trolley would travel across these splices, these forces would deflect down and out which created additional eccentricities and unintended horizontal loading on the rack system. The repeated eccentric loading created by the improper splice caused screws throughout the system to become loose and, in many cases, fall out. The instability of the splice rails allows the Feeders to create larger eccentric loads as the Feeder will not stay plumb to the caging system. Also, as the Feeders put weak-axis load on the rails, it creates a larger eccentric load to the racks horizontally;

(f)  While the poultry caging system was used for its intended purposes, the caging system collapsed, which would not ordinarily occur absent a product defect that existed at the time the system left Defendants' control; and

(g)  In such other and further particulars as the evidence at trial may show.

26.  The defects outlined above were latent and not observable by Plaintiff.

27.  As a direct and proximate result of one or more of the defective conditions of the products as outlined above, the collapse of the poultry caging system occurred and caused substantial damage to Plaintiff's real and personal property as well as a loss of profits to Plaintiff.

## Count 2 – Breach of Implied Warranties

28.  Plaintiff incorporates by reference paragraphs 1 through 23 above as if each were incorporated herein by reference.

29.  The products sold by Defendants were not of merchantable quality or fit for their particular purpose for the reasons set forth in paragraph 21 above.

30. Defendants' impliedly warranted that their products were of merchantable quality and were fit for their particular purpose.

31. As a direct and proximate result of the failure of the products to be of merchantable quality and fit for their particular purpose, the collapse occurred and caused substantial damage to Plaintiff's real and personal properties as well as lost income from its business.

**Count 3 – Negligence**

32. Plaintiff incorporates by reference paragraphs 1 through 27 as if each were incorporated herein by reference.

33. Defendants owed a duty to exercise reasonable care to avoid a foreseeable risk of injury to others, to use reasonable care to inspect the poultry caging systems, to use reasonable care to make the poultry caging systems safe or to warn others of their dangerous propensities and of hazards associated with the use of their poultry caging systems, to exercise care to discover dangerous propensities of the poultry caging systems, to deliver poultry caging systems fit for their intended purpose, to perform their services with care, skill, and reasonable experience, and to exercise ordinary care in the design, production, and sale of their poultry caging systems.

34. For the reasons outlined in paragraph 21 above, Defendants breached their duties, and the poultry system collapse in question was caused by the negligence, carelessness and recklessness of Defendant Tecno LLC and Defendant Tecno SpA in their design, manufacturing, and installation of the poultry caging systems.

35. As a direct and proximate result of the negligence, carelessness and recklessness of Defendants, the products sold by them caused the collapse and the damages to Plaintiff's personal property, as well as lost income.

-7-

Case 5:21-cv-04007-CJW-MAR   Document 1   Filed 02/11/21   Page 7 of 9

## DAMAGES

36. Plaintiff incorporates by reference paragraphs 1 through 31 as if each were incorporated herein by reference.

37. As a direct and proximate result of Defendants' conduct, Plaintiff suffered real and personal property damages estimated in an amount in excess of $21,000,000.00.

38. The collapse caused substantial damage to the poultry caging system egg conveyor, and environmental control systems in Barns 17 and 18.

39. Plaintiff also suffered significant business interruption loss and extra expenses.

## CONDITIONS PRECEDENT

40. All conditions precedent to Plaintiff's right to recovery have been fully performed by Plaintiff or waived by Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Rembrandt Enterprises, Inc., prays that this Court enter judgment against Defendants, Tecno Poultry Equipment S.p.A. f/k/a Tecno Poultry Equipment S.R.L. and Tecno Poultry Systems, LLC, for actual damages, prejudgment and post judgment interest, costs of suit, and all other relief the Court deems appropriate.

## JURY DEMAND

Plaintiff Rembrandt Enterprises, Inc. hereby demands a trial by jury as to each of the counts of this Complaint.

                              Respectfully submitted,

                              WHITFIELD & EDDY, P.L.C.
699 Walnut Street, Suite 2000
Des Moines, IA 50309
Telephone: 515-288-6041
Facsimile: 515-246-1474
Email: henderson@whitfieldlaw.com

By: */s/ Thomas Henderson*
      Thomas Henderson    PK0002295
ATTORNEYS FOR PLAINTIFF

MOTION FOR PRO HAC VICE TO BE FILED REGARDING THE FOLLOWING:

OF COUNSEL:
Lawrence T. Bowman
State Bar No. 00788993
lbowman@krcl.com
David H. Fisk
State Bar No. 24050602
dfisk@krcl.com
KANE RUSSELL COLEMAN LOGAN PC
901 Main Street, Suite 5200
Dallas, Texas 75202
Tel: 214.777.4200
Fax: 214.777.4299

    and

Kevin P. Caraher
Iowa Bar No. AT0012838
kcaraher@cozen.com
COZEN O'CONNOR
123 N. Wacker Drive, Suite 1800
Chicago, Illinois 60606
Tel: 312-382-3100
Fax: 312-706-9792