**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

REMBRANDT ENTERPRISES, INC.,

        Plaintiff,

vs.

TECNO POULTRY EQUIPMENT, SpA,
f/k/a TECNO POULTRY EQUIPMENT,
SRL,

        Defendant.

No. 21-CV-4007 CJW-KEM

**MEMORANDUM OPINION AND
ORDER**

_____

**TABLE OF CONTENTS**

I.     BACKGROUND ................................................................................ 3

     A.    Procedural History ................................................................. 3

     B.    Factual History ...................................................................... 3

II.    SUMMARY JUDGMENT STANDARD ............................................... 9

III.   DISCUSSION ................................................................................. 11

     A.    Strict Products Liability ......................................................... 12

           1.    Applicable Law ........................................................... 13

           2.    Intended Design .......................................................... 14

           3.    Design Departure ........................................................ 14

           4.    Whether Departure Caused the Harm ............................. 16

1

B.     Breach of Implied Warranties .....................................................17

    1.     Applicable Law ................................................................18

    2.     The Limitations Period Has Run .......................................20

C.     Count III: Negligence .............................................................21

    1.     Negligence in Defective Design ........................................24

        a.     Applicable Law ....................................................24

        b.     The Existence of a Reasonable Alternative Design .........25

        c.     Can Plaintiff Show a Reduction in Foreseeability ..........27

    2.     Negligence in Inadequate Instructions ................................27

        a.     Applicable Law ....................................................27

        b.     Reducing or Avoiding the Foreseeable Risk of Harm with Reasonable Instructions..........................................28

        c.     Can Plaintiff Show the Risk was not Obvious ...............29

    3.     Negligent Supervision.....................................................30

        a.     Applicable Law ....................................................30

        b.     Knowledge of the Employee's Unfitness at the Time the Employee Engaged in Wrongful or Tortious Conduct ......31

        c.     Causation ...........................................................31

        d.     Can Plaintiff Show Employment or an Agency Relationship ..............................................33

IV.    CONCLUSION ...............................................................................33

This matter is before the Court on defendant's motion for summary judgment on plaintiff's complaint alleging strict products liability, breach of implied warranties, and negligence. (Docs. 71; 74). For the following reasons, the Court **denies** the motion as to negligence (Count III) **and grants** defendant's motion for summary judgment as to strict products liability (Count I) and breach of implied warranties (Count II).

## I.    BACKGROUND

The following facts are undisputed unless otherwise noted. The Court will consider additional facts as they become relevant to its analysis.

### A.    Procedural History

On February 11, 2021, plaintiff filed this suit alleging strict products liability, breach of implied warranties, and negligence. (Doc. 1). On March 30, 2021, defendant filed its answer. (Doc. 15). On August 15, 2022, defendant filed a motion for summary judgment as to all counts of the complaint under Federal Rule of Civil Procedure 56. (Doc. 71). On September 6, 2022, plaintiff timely filed its resistance (Doc. 78), and on September 14, 2022, defendant timely filed its reply (Doc. 83). On October 4, 2022, plaintiff filed an amended brief in support of its resistance. (Doc. 84). On October 11, 2022, the Court heard oral argument on the motion for summary judgment. (Doc. 87).

### B.    Factual History

This case arises out of the collapse of a poultry caging system. Plaintiff is the owner-operator of an egg farm which produces, processes, and distributes liquid, powder, and other-egg based food products for manufacturing and processing companies. (Docs. 71-1, at 1; 78-2, at 1-2). Defendant is a foreign business entity that designs and manufactures poultry housing systems, including egg collection equipment and trolley feeding systems. (Docs, 71-1, at 1-2; 78-2, at 2). Stanley & Sons ("Stanley"), which is no longer in business, was a third party with whom plaintiff contracted for the assembly

and installation of the poultry caging system involved here ("the System"), which defendant designed and manufactured. (Docs 71-1, at 2; 78-2, at 2).

Plaintiff used the System in one of its facilities. This facility, plaintiff's Rembrandt, Iowa facility, had 20 poultry barns on site in 2007, some of which are termed "Super Barns" because the structure is split into two separate barns or two adjoining barns with a shared roof. (Docs. 71-1, at 3; 78-2, at 3). Barns 17 and 18 constitute one of plaintiff's Super Barns. (Doc. 71-1, at 3; 78-2, at 4). Stanley installed the System in Barn 17—a pre-engineered building with exterior-exposed steel frames, purlins, exterior-exposed girts, and insulated metal panels that were attached to the inside of the frames and girts–in 2007. (Docs. 71-1, at 3; 78-2, at 4).

The parties dispute the makeup of the System. Defendant asserts each row of the System contained 117 modules, each 1100 mm in length, resulting in a total length of cages of 12,870 mm or 422 feet, 3 inches, with each row contained in ten levels of cages. (Docs. 71-1, at 3-4; 78-2, at 4-5). Plaintiff disputes this, stating that a row contained 117 modules, each 1100 mm in length, resulting in a total length of 128,700 mm or 12,870 cm or 422 feet, 3 inches and adds that there were eight rows of cages in Barn 17. (Doc. 78-2, at 4-6). Also, defendant states that the tiers with each row each has an egg and manure conveyor system that serviced that particular tier level; the egg collection conveyor drives and collection towers were located at the east end of the Barn, and the manure conveyor drives and collection pits were at the west end. (Doc. 71-1, at 5; 78-2, at 6). Plaintiff says this is not so; though it is undisputed that the various tiers within each row had both an egg conveyor system and a manure conveyor system that serviced each tier level, it is disputed that the manure conveyor drives and collection pits at the west end are depicted in the right side of figure 4 in defendant's statement of facts. (Docs. 71-1, at 4-5; 78, at 5-6). The System included feed trolleys that operated four times a

4

day to feed the poultry by filling troughs through chutes that attached to the feed trolleys. (71-1, at 5-6; 78-2, at 6-7).

On July 19, 2006, plaintiff contracted with defendant to provide the System for Barns 17 and 18. (Docs. 71-1, at 6). The pricing included the equipment, freight, and a line item set at $24,000 for "ASSEMBLING: supervision with one technician for 10 weeks, food hotel, [sic] accommodation and traveling included," and defendant also provided the Instruction Manual ("Manual")[1] for assembling the System.[2] (Docs. 71-1, at 6, 7; 78-2, at 7, 8). On November 17, 2006, plaintiff entered into a contract with Stanley for the installation of the System in Barns 15, 16, 17, and 18. (Docs. 71-1, at 7; 78-2, at 8). On December 19, 2006, plaintiff and defendant executed, at plaintiff's request, plaintiff's "Standard Form Agreement" further memorializing the agreement between the parties. (Docs. 71-1, at 7; 78-2, at 8). Construction of Barn 17 and 18 finished in 2007, and on February 17, 2007, defendant provided written waiver of lein advising that the provision of materials and equipment for Barn 17 was complete. (Docs. 71-1, at 7; 78-2, at 9).

Over a decade had passed since the installation when on February 14, 2020, Barn 17's System collapsed, killing Humberto Jesus Lopez. (Docs. 30; 78-2, at 9). Mr. Lopez was employed as a contract laborer in the barn and was in the barn when it collapsed on top of him, resulting in his death. (Docs. 30; 78-2, at 9). The collapse also

---

[1] The Instruction Manual, plaintiff asserts, had no written explanation about assembling the caging system, details including how many self-tapping screws needed to be installed, restrictions as to where splices and bolts needed to be located, or alternative methods of assembly of the caging systems. (Doc. 78-2, at 8-9).

[2] A technician was part of the contract because Tecno had never previously sold a caging system in the United States, meaning no United States-based installers were experienced installing the System. (Doc. 78-2, at 8).

5

led to major damage to the caging system, building structure, chickens, eggs, and equipment. (Docs. 71-1, at 7; 78-2, at 9).

After the collapse, plaintiff retained expert, Tony Childress, who opined the System collapsed because of four factors: (1) Stanley & Sons' "failure to install all 6.3 x 19 self-drilling fasteners from the top side of the knuckle bracket"; (2) Stanley & Son's decision to utilize splices in the feeder rails that were "located too far away from the vertical stanchions"; (3) Stanley & Sons' "failure to install the catwalk in accordance with the Manual"; and (4) the failure of attachment clips that support the feeder rails as a result of additional forces created on the System because of the first three factors. (Docs. 71-1, at 7-8; 78-2, at 9-10).

Childress also opined that Stanley failed to install fasteners in the top sides of the knuckle brackets used to connect to stanchions and a lateral support member, the failure of which contributed to the collapse, as the relevant knuckle brackets needed to be installed with four fasteners at specific locations. (Docs. 71-1, at 8; 78-2, at 10-11). A few of the fasteners at the bottom of the knuckle brackets were missing and none of the top two fasteners were installed by Stanley. (Docs. 71-1, at 9; 78-2, at 11-12).

According to defendant, Childress also opined that "The manual clearly shows these fasteners should be installed in the knuckle brackets." (Doc. 71-1, at 9; 78-2, at 12). Plaintiff disputes that Childress opined that the manual clearly shows this requirement, asserting that Childress opined that "[t]he manual clearly shows these fasteners" but that it was the response from legal counsel and a deposition by Michelle Cattapan that indicated that these fasteners were required:

> The report paragraph discussing the manual stated: "More concerning is the trail of information obtained from the depositions of the witnesses which was conflicting and inconsistent with TPE produced documents, engineering, and opinions. TPE, through their witnesses, confirmed no calculations could be found for the system installed at Rembrandt. The TPE witnesses also confirmed the calculations provided to CES with a

6

referenced date of September 28, 2006, were performed post-collapse (that
is after February 14, 2020). Responses from some of the TPE witnesses
conflict with the TPE calculations and are also in conflict with TPE
documentation and other TPE witnesses. The biggest conflict is regarding
the top two 6.3mm fasteners at the knuckle bracket. The manual clearly
shows these fasteners and response from legal counsel for TPE after a
request from CES confirmed all the fasteners are required per the manual.
Michelle Cattapan, in his deposition, confirmed the manual has the top and
bottom 6.3 mm fasteners depicted and that they were required per his
knowledge and experience with TPE. He also stated the TPE Manual was
new and created by a 3rd party outside of TPE. Cattapan reported the
Manual was not well put together by the 3rd party and it was his
handwriting found throughout the Manual in an attempt to add the pertinent
information that was missing (including the screws).

(Doc. 78-2, at 12). Additionally, plaintiff states that the Manual does not say anywhere
that the self-tapping fasteners do not need to be installed if the cages are assembled one
level at a time, nor does it depict the correct locations in the knuckle bracket to insert the
fasteners.[3] (Doc. 78-2, at 12-13).

Childress identified instances where the "splices" in the installation of the feeder
rails were located "midspan" between the vertical support stanchions, and he opined that
the location of these splices contributed to the system collapse. (Doc. 71-1, at 10; 78-2,
at 14). Parties dispute Childress's analysis of the instructions that the Manual provided
for the splices. (Docs. 71-1, at 10; 78-2, at 14). Defendant states that as to the second
factor, Childress noted that the Manual indicated the splices needed to be located near a
vertical stanchion. (Docs. 71-1, at 10; 78-2, at 14). Plaintiff states Childress said that
the Manual indicates the splices were to be located near a vertical stanchion while he was
discussing a drawing within the Manual that shows a splice near a stanchion, and the

---

[3] The parties provided a photograph of the Manual in which it shows via a picture where to place
fasteners. (Docs. 71-1, at 10; 78-2, at 12-13). Plaintiff provides that the depiction in the
photograph incorrectly shows that self-tapping screws should be installed in the center of the
knuckle bracket instead of the upper and lower ends. (Doc. 78-2, at 13).

7

Manual does not say anything about splices being located near a vertical stanchion or that splices must not be located mid-span between stanchions. (Doc. 78-2, at 14). Further, the Manual characterizes the location of the feeder rail splices near the stanchions. (Docs. 71-1, at 11; 78-2, at 15).

Childress further opined on the installation of the catwalk. (Docs. 78-2, at 16; 71-1, at 12). The System's catwalks are designed to move with the building movements and thermal changes without putting forces on the caging system. (Docs. 71-1, at 12; 78-2, at 16). Childress, however, opined that the catwalk was attached directly to the perimeter of the structure without expansion, contraction slots, or any consideration of movement, which contributed to the collapse. (Docs. 78-2, at 16; 71-1, at 12). He opined that this installation did not conform with the Manual, which shows "slots at each end of the catwalk connection with the bolt from the knuckle bracket centered on the slot[.]" (Docs. 71-1, at 12; 78-2, at 16). As a result he explained there was no proper movement. (Docs. 71-1, at 12; 78-2, at 16). The Manual also contains a drawing of a bolt near the center of the slotted connection but, plaintiff argues, does not state that the bolt must be installed in the center of the slot or that the bolt should not be installed at either end of the slot. (Doc. 78-2, at 16).

Finally, Childress opined the attachment clips that support the feeder rails came into contact with the feed trolley wheels, and thus failed; this failure caused the rails to become loose, which in turn, caused potential movement as the feeder passed from one end to the other of the row of cages. (Docs. 71-1, at 12; 78-2, at 17). This failure, he opined, was caused by the instabilities within the System due to the increased load on the System created by Stanley's failure to install the fasteners, the use of midspan splices, and the failure to properly connect the catwalk systems to the building itself. (Docs. 71-1, at 12; 78-2, at 17).

8

Rembrandt seeks damages for demolition and remediation of the System following the collapse, replacing the System, business interruption, loss of the birds, and claims preparation fees. (Docs. 71-1, at 13; 78-2, at 17).

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). When asserting that a fact is undisputed or is genuinely disputed, a party must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Alternatively, a party may show that "the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(B). More specifically, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." FED. R. CIV. P. 56(c)(2).

A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). "An issue of material fact is genuine if it has a real basis in the record." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992). It is also genuine "when a reasonable jury could return a verdict for the nonmoving party on the question," *Wood v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (internal quotation marks omitted). Evidence that presents only "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249–50, does not make an issue of fact genuine. In sum, a genuine issue of material

fact requires "sufficient evidence supporting the claimed factual dispute" that it "require[s] a jury or judge to resolve the parties' differing versions of the truth at trial." *Id.* at 249 (citation and internal quotation marks omitted).

The party moving for summary judgment bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395. The plaintiff may not then simply point to allegations made in her complaint but must identify and provide evidence of "specific facts creating a triable controversy." *Jaurequi v. Carter Mfg. Co.*, 173 F.3d 1076, 1085 (8th Cir. 1999) (internal quotation marks omitted). When considering a motion for summary judgment, "[t]he court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3). Even so, the moving party does not meet its burden by simply providing a massive record, and the Court "will not sort through a voluminous record in an effort to find support for the plaintiff's allegations." *Howard v. Columbia Pub. Sch. Dist.*, 363 F.3d 797, 800 (8th Cir. 2004).

The moving party's burden of production turns on its burden of persuasion at trial. If the moving party bears the burden of persuasion on the relevant issue at trial, it must support its motion with credible evidence available under Rule 56(c) that would entitle it to a directed verdict if not challenged at trial. *Celotex Corp.*, 477 U.S. at 331; *Firemen's Fund Ins. Co. v. Thien*, 8 F.3d 1307, 1310 (8th Cir. 1993). But, if the moving party does not bear the burden of persuasion at trial, it has two options to satisfy its Rule 56 burden of production. First, it may submit affirmative evidence that negates an essential element of the nonmoving party's claim. *Celotex Corp.*, 477 U.S. at 331 (1986); *see also Bedford v. Doe*, 880 F.3d 993, 996 (8th Cir. 2018). Second, it may show that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim. *Id.*

Once the moving party meets its burden of production, the nonmoving party must go beyond the pleadings and show by depositions, affidavits, or other evidence "specific facts which create a genuine issue for trial." *See Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005) (internal quotation marks omitted). In determining whether a genuine issue of material fact exists, courts must view the evidence in the light most favorable to the nonmoving party, giving that party the benefit of all reasonable inferences that can be drawn from the facts. *Tolan v. Cotton*, 572 U.S. 650, 651 (2014); *Matsushita*, 475 U.S. at 587–88 (citation omitted); *see also Reed v. City of St. Charles*, 561 F.3d 788, 790 (8th Cir. 2009). A court does "not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Rather, a "court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co.*, 90 F.3d 1372, 1377 (8th Cir. 1996).

Here, plaintiff bears the burden of persuasion on all claims asserted. Defendant, as movant for summary judgment, bears the burden of production. Thus, in each part of its analysis, the Court will begin by determining whether defendant meets its initial burden. If not, the Court must deny summary judgment. If so, the Court will then determine whether plaintiff raises a genuine dispute of material fact.

## III.   DISCUSSION

Plaintiff sued defendant in a three-count complaint. (Doc. 1). In Count I, plaintiff alleged that defendant is subject to strict products liability because the collapse was the result of defects in defendant's product. (*Id.*, at 5-6). In Count II, plaintiff alleged breach of implied warranties, namely merchantability and fitness for a particular purpose. (*Id.*, at 6-7). In Count III, plaintiff alleged defendant was negligent in designing, manufacturing, and inspecting the System. (*Id.*, at 7). More specifically, plaintiff alleges

that the instruction manual was defective, and defendant was negligent in supervising Stanley, who was hired to put the System together on site. (Doc. 84, at 10-13).

For the following reasons, the Court **grants** defendant's motion for summary judgment on Counts I and II, but it **denies** defendant's motion on Count III regarding plaintiff's negligent-supervision theory. Plaintiff failed to show a genuine dispute of material fact on several elements of Count I. Plaintiff failed to assert Count II before the relevant statute-of-limitations expired. As for Count III, plaintiff can show a genuine dispute of material fact on the negligent-supervision theory. The Court will address defendant's argument for summary judgment on each count.

The parties' arguments in support and in resistance of defendant's motion, both in their written briefing and at oral argument, are fact-intensive. The Court's discussion of facts at this stage is not intended to be exhaustive. The Court analyzes the undisputed facts or disputed facts, as appropriate, to determine the claims on which a reasonable jury could find in plaintiff's favor. As such, the Court does not discuss or reach all of plaintiff's arguments or evidence in support thereof.

### A. *Strict Products Liability*

Again, plaintiff alleges that defendant is subject to strict products liability because the collapse was the result of defects in defendant's product. (Doc. 1, at 5-6). Defendant argues plaintiff's strict liability claim fails because plaintiff does not allege a manufacturing defect, and a manufacturing defect is the only defect-type for which one may be held strictly liable under Iowa law. (Doc. 74, at 6-9; 83, at 6-8). Instead, defendant asserts plaintiff has only claimed improper assembly of the product defendant manufactured, which cannot constitute a claim for strict liability. (Docs. 71, at 2-3; 74, at 9). Further, there has been no showing, defendant argues, that any inadequate instruction caused the collapse. (Doc. 83, at 6-8).

Plaintiff responds that its claim does not fail because, under the Restatement Third of Torts, incorrect assembly is listed as an example of a manufacturing defect. (Doc. 84, at 8-10). Further, because the product and responsibility for the product did not leave defendant's hands until the System was completely assembled and installed, plaintiff states that is the type of assembly defect contemplated in the Restatement and must be considered part of the System's manufacturing stage. (Doc. 84, at 8-10).

For the following reasons, the Court **grants** summary judgment in favor of defendant on the strict liability claim.

### 1. Applicable Law

In Iowa, strict liability attaches in certain types of product defect cases. Iowa law applies strict liability to claims of manufacturing defects, design defects, and inadequate instructions or warnings, applying the Products Restatement. *Wright v. Brooke Group, Ltd.*, 652 N.W.2d 159, 168 (Iowa 2002). A product "contains a manufacturing defect when the product departs from its intended design even though all possible care was exercised in the preparation and marketing of the product[.]" RESTATEMENT (THIRD) OF TORTS: PRODUCT LIABILITY § 2(a) (AM. L. INST. 1998). "A departure from the intended design of a product cannot be determined without knowing the actual intended design of the product. Thus, under Iowa law, an essential element of any manufacturing defect claim is the intended design of the product." *Depositors Ins. Co. v. Wal-Mart Stores, Inc.*, 506 F.3d 1092, 1095 (8th Cir. 2007). Thus, a plaintiff must offer evidence showing both (1) the intended design of the product and (2) how the manufacturing of that product departed from the intended design of that product. Finally, plaintiff must show a genuine issue as to whether the defect caused the alleged harm. *See Estate of Thompson v. Kawasaki Heavy Indus., Ltd.*, 922 F.Supp.2d 780, 789 (N.D. Iowa 2013); *Hagen v. Texaco Ref. & Mktg., Inc.*, 526 N.W.2d 531, 537 (Iowa 1995).

### 2.    *Intended Design*

Defendant does not meet its initial burden as to the intended System design. Defendant does not argue that plaintiff's evidence is insufficient to establish the intended design, nor does defendant point to any evidence or facts in the record negating plaintiff's asserted intended design.

Because defendant has not met its initial burden on the element of intended design, the Court does not evaluate plaintiff's arguments on this issue.

### 3.    *Design Departure*

Defendant argues that plaintiff cannot show a design departure because plaintiff only alleges improper assembly, and defendant was contractually not responsible for the assembly of the product on site. (Doc. 71, at 2). Further, there was a separate contract for the assembly which led to subsequent conduct by someone other than defendant— Stanley; that conduct does not create a manufacturing defect that existed "when it left the hands of" defendant. (Docs. 71-3, at 161-63; 83, at 2-3). Defendant also points to the fact that although it agreed to supervise Stanley's installation of the product, its involvement in and separate contractual duty related to installation does not turn the installation and post-production assembly errors into manufacturing errors. (Docs. 71-1, at 12; 71-2, at 147; 71-3, at 161-63; 83, at 2-3).

Plaintiff fails to show a genuine dispute of material fact on an alleged design departure because plaintiff fails to show a departure from the original intended design.[4]

---

[4] Though it cannot be used here to evaluate the element of intended design because defendant has not met its burden on the element, it is helpful for the Court to note plaintiff's showing as to the intended design, given it must evaluate any departure from that design. Plaintiff has not shown a genuine issue as to the intended design of the product. Plaintiff mentions that because of the depositions of Paolo Tarquini and Luca Tesser stating some of the self-tapping screws were unnecessary, a reasonable alternative design would be for the manual to state two methods of acceptable on-site assembly. (Doc. 84, at 11-12). This does not explain or provide evidence of the intended design. Plaintiff mentions the SAP 2000 model input data and that the data, in

Plaintiff suggests the user manual was deficient and that the drawings led to the installation errors, leading to the collapse. (Docs. 71-2, at 20; 71-3, at 30; 78-2, at 10). Plaintiff does not, however show how a failure to follow directions by an installer, even if supervised by someone employed by the manufacturer-seller, creates a departure from the intended design; it cites no law or fact to indicate departure. This failure to follow directions—when the product's pieces themselves have not been shown to have departed from their design—cannot establish that the product itself departed from the intended design.

Further, it is not clear that the instructions were defective in a manner that would show that the product departed from the intended design at the manufacturing stage. Plaintiff argues the instructions were defective, making the product a departure from the intended design, because the instructions did not explicitly state where the splices would go. (Doc. 78-2, at 14). The manual, however, shows that the splices go near the vertical stanchion. (Doc. 71-2, at 146). The absence of explicit verbal instructions in favor of visual depictions alone does not create a genuine issue as to whether the product itself departed from the intended design at the manufacturing stage. Childress stated and both parties agreed in their respective statements of undisputed facts, that putting the splices in the feeder rails too far from the vertical stanchions was "Stanley & Son's decision[,]" indicating an independent decision different from that instructed by the manufacturer. (Doc. 78-2, at 13-14). Further, Childress stated specifically the failure of the clips on the feeder rails had nothing to do with the "clips themselves as designed or installed." (Docs. 71-1, at 12; 71-2, at 145). Childress stated specifically that Stanley failed to install the catwalk *in accordance with the manual*, indicating the manual provided specific

---

its view, contradicts Paolo Tarquini and Luca Tesser's opinions that the self-tapping screws on top of the knuckle bracket were not needed. (*Id.*, at 11). Otherwise, plaintiff provides no evidence in the record upon which a reasonable jury could determine an intended design.

instructions for building the catwalk.  (Doc. 71-2, at 142-44).  As poor as the instructions may or may not have been, the product itself has not been shown to have been defectively designed based on Stanley's failure to strictly adhere to such instructions.  Plaintiff has not shown a genuine issue of material fact as to the element of departure from intended design and thus is not entitled to judgment in its favor on this count.

### 4. *Whether Departure Caused the Harm*

At oral argument, defendant stated that plaintiff has failed to connect any issue with the manufacture of the product to the collapse.  (Doc. 87).  Specifically, defendant emphasizes that the alleged incorrect assembly claimed to have caused the collapse has nothing to do with the manufacture of the System.  (Doc. 74, at 7-9).

Plaintiff has not pointed to any evidence upon which a reasonable jury could find that defective manufacturing caused the collapse based on the undisputed facts.  Plaintiff focuses on errors in the assembly stage discussed earlier, asserting that because defendant retained responsibility when it supervised the System build, the assembly is part of the manufacturing stage.  (Docs. 71-3, at 300; 78-2, at 7, 8, 10; 84, at 8-10).  Specifically, plaintiff emphasizes that several items listed in the instructions and provided by defendant were not installed or were incorrectly installed, including fasteners, the catwalk, splices, and the feeder wheels.  (Docs. 1, at 5-9; 78-1, at 303-05; 78-2, at 1-43) ("Assembling:[ ] supervision [sic] with one technician for 10 weeks, food, hotel accommodation and travelling [sic] included.").  Plaintiff thus alleges that an error in assembling the product post-production at its final location caused the collapse.  Plaintiff does not, however, cite to a single case, nor did the Court find one, supporting the assertion that an assembly error, as referenced in the Restatement, includes an error committed by a builder other than the manufacturer that occurs when putting a product together outside the factory setting.  There is no indication such construction differs from a contractor building a

home with items already manufactured and assembled in a factory, which could also be called assembly.

Though the Restatement discusses defects that may be atypical manufacturing defects, a plaintiff must show that those atypical defects existed when the product left the manufacturer's hands. RESTATEMENT (THIRD) OF TORTS: PRODUCT LIABILITY § 2 cmt. c (AM. L. INST. 1998). Further, liability may only attach further down the sales-line if the later non-manufacturer-seller introduced some defect before the product reached the buyer, such as upon final assembly or an inspection defect. *Id.* Again, plaintiff has not provided any evidence or citation that shows final assembly by a subsequent seller includes a contractor assembling pre-manufactured parts to build a larger structure, such as here. Thus, no reasonable jury could find, based on the record, any fact that supports the theory that the incorrect assembly that caused the collapse was a manufacturing defect. As that is the theory plaintiff offers in favor of its strict liability manufacturing defect claim, no reasonable jury could conclude any manufacturing defect to have caused the collapse of the System.

There is no genuine issue of material fact as to the element of causation.

Plaintiff has failed to show any genuine issues of material fact on the second and third issues of a manufacturing defect claim. Because no reasonable jury could find for plaintiff on these issues, no reasonable jury would find in plaintiff's favor on this Count. Thus, defendant is entitled to summary judgment on plaintiff's strict liability manufacturing defect claims.

For these reasons, the Court **grants** defendant's motion for summary judgment as to Count I.

### B. *Breach of Implied Warranties*

Defendant argues plaintiff's claims of breach fail for two reasons: (1) because plaintiff cannot show a product defect, it also cannot show breach of implied warranties,

17

and even if plaintiff could show breach, (2) the statute-of-limitation has run, preventing plaintiff from prevailing on its implied warranty claims. (Doc. 74, at 24-26). More specifically, defendant asserts that no defect has been sufficiently alleged as defined under the Restatement, and even if one were sufficiently shown, the statute-of-limitation started to run upon delivery of the System in 2007. (Doc. 74, at 24, 25-26). They argue any claim expired in 2012 under *Fell v. Kewanee Farm Equip. Co.*, 457 N.W.2d 911 (Iowa 1990), but cite to no provision of Iowa Code Section 614.1 to support the limitation period. (Doc. 74, at 25-26).

Plaintiff does not provide any new arguments as to its breach claims. In its complaint, plaintiff alleged that "[t]he in-plane loads created by the building and from the feeder trolley on loose rails along with missing screws at the critical knuckle bracket created excessive, cyclic forces on the connection" triggering the collapse. (Doc. 1, at 5, 6). Thus, it argues, the products were not fit for their particular purpose, nor were they merchantable—i.e., fit for their ordinary purpose. (Doc. 1, at 6-7).

For the following reasons, the Court **grants** defendant's motion for summary judgment as to Count II.

### 1. *Applicable Law*

Under contract law, certain implied warranties exist to protect the buyer should a product be different from its normal or anticipated condition, such as its understood purpose. Breach of the implied warranty of merchantability exists when goods are not fit for their *ordinary* purpose. *The Conveyor Co. v. Sunsource Tech. Servs. Inc.*, 398 F.Supp.2d 992, 998 (N.D. Iowa 2005). A plaintiff claiming breach of merchantability must prove: "(1) a merchant sold the goods, (2) the goods were not 'merchantable' at the time of sale, (3) injury or damage occurred to the plaintiff's property, (4) the defective nature of the goods caused the damage 'proximately and in fact,' and (5) notice was given to the seller of the damage." *Id.*, at 1000 (alteration in original). In examining the

merchantable goods element, courts look to relevant provisions of the Iowa Uniform Commercial Code, since the warranty is statutory. *See* IOWA CODE § 554.2314.

A plaintiff may also allege breach based on the implied warranty of fitness for a particular purpose ("fitness"), which looks at the specific purpose the buyer has for the product. At the time of contracting, if the seller has reason to know of "any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under section 554.2316 an implied warranty that the goods shall be fit for such purpose." IOWA CODE § 554.2315 (2022). To prevail on a claim of breach of the implied warranty of fitness under Iowa Code, a plaintiff must establish that: "(1) the seller had reason to know of the buyer's particular purpose; (2) the seller had reason to know the buyer was relying on the seller's skill or judgment to furnish suitable goods; and (3) the buyer in fact relied on the seller's skill or judgment to furnish suitable goods." Iowa Code § 554.2315 (2022); *Sparks v. Wright Med. Tech. Inc.*, No. 12-CV-84-LRR, 2013 WL 179211, at *4 (N.D. Iowa Apr. 22, 2013); *Renze Hybrids, Inc. v. Shell Oil Co.*, 418 N.W.2d 634, 637 (Iowa 1988).

Claims of breach of implied warranties must be brought within the applicable limitations period. Iowa law provides that in a products liability action involving a contract for the sale of goods, any resulting breach of implied warranty claims under the Uniform Commercial Code are subject to Iowa Code Section 554.2725. *Fell*, 457 N.W.2d at 913, 919. Thus, any statute-of-limitation related to implied warranty breaches on a contract for the sale of goods in Iowa begins to run upon tender of delivery of the goods. *Id.*, at 919; § 554.2725(2) (holding that a breach of warranty occurs at the time "tender of delivery is made, except that where a warranty *explicitly* extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been

discovered.") (emphasis added). Further, Iowa Code provides the statute-of-limitation for written contracts not related to rent is ten years. IOWA CODE § 614.1(5) (2022).

### 2. *The Limitations Period Has Run*

The Court finds that plaintiff's Count II claims are no longer available, as plaintiff brought them after the applicable statute-of-limitations expired. For that reason, the Court grants judgment as a matter of law in favor of defendant on Count II.

In its motion for summary judgment defendant states without citing any statute-of-limitation and relying entirely on *Fell*, that the statute-of-limitation expired in 2012, five years after the purported product delivery. (Doc. 74, at 25-26). The code provision governing periods for written contracts, however, provides a ten-year statute-of-limitation.[5] § 614.1(5) ("Except as provided in paragraph 'b', those founded on written contracts, or on judgments of any courts except those provided for in subsection 6, and those brought for the recovery of real property, within ten years."). Here, defendant has produced evidence showing there was a contract. (Docs. 74, at 3; 71-3, at 137-160). That evidence shows that the contract was written. (Doc. 71-3, at 137-160). Thus, the written contract is governed by Section 614.1(5) and subject to a ten-year statute-of-limitation.

Further, under Iowa Code, the statutory period began running upon completed delivery of the product. § 554.2725(2). Delivery of the product—regardless of whether delivery was completed the moment the materials were brought to the build site or, as plaintiff appeared to suggest at oral argument, upon complete installation of the product—

---

[5] This section provided a ten-year limitation period at the time of contract formation in 2006, delivery and installation in 2007, and collapse in 2020. *See* IOWA CODE § 614.1(5) (2005); IOWA CODE § 614.1(5) (2007); IOWA CODE § 614.1(5) (2020). Never during the relevant timeframe has the provision provided a five-year limitation period for written contracts, though defendant argues the limitations period ended in 2012.

was tendered in 2007, as both events occurred in 2007.[6]  (Docs. 1, at 3; 74, at 3; 87).  Thus, there is no dispute that the statutory period began running in 2007.  Plaintiff had ten years to bring its breach of implied warranty claims, and it could no longer bring those claims after the period ended in 2017.  Thus, both of plaintiff's claims for breach of implied warranties are barred, having expired in 2017.

Because plaintiff would no longer be entitled to relief on these claims regardless of the merits, the Court does not address those merits here.  Thus, the Court **grants** defendant's motion for summary judgment as to Count II.

### C.    *Count III: Negligence*

Plaintiff brings a multiple-theory negligence claim here.  First, it alleges defective design, then negligent failure to warn or instruction, and finally negligent supervision.

Defendant argues plaintiff's negligence claim fails for several reasons.  First, negligence based on defective design fails because plaintiff has not alleged such defect and has expressly disclaimed any such allegations in discovery.  (Doc. 74, at 9-10).  Defendant alleges that plaintiff makes no design defect allegation related to the System and states plaintiff alleges "Tecno Poultry Equipment's user manual was deficient in its installation instructions.  The instructions were ambiguous and unclear.  There should have also been better instructions on how to maintain the system and they should have recommended quality control measures" but not that defendant should have used a different design.  (Doc. 71-1, at 8; 78-2, at 10).

Plaintiff states that is not what plaintiff argued; the response defendant refers to was plaintiff's answer to interrogatory 12, and that question was directed at "alternative design as to the caging system itself, the egg collection conveyors, the manure conveyors

---

[6] Though the Court would normally address the specific date of delivery to properly state the exact dates upon which the statute-of-limitation began and stopped running, that fact is immaterial on this issue because the period ended five years ago and the precise dates will not determine whether plaintiff has timely brought the breach claims.

systems, including the Belt systems, and the Barn structures themselves." (Doc. 78, at 10). Plaintiff continues that plaintiff:

> responded that it was not alleging that the design of the cage system itself was deficient but that Tecno's "user manual was deficient in its installation instructions" which "were ambiguous and unclear". In that answer but omitted by Tecno in its Statement of Undisputed Material Facts, Plaintiff also stated that "Tecno Poultry Equipment also failed to provide adequate design drawings which led to serious errors and omissions during the installation that it was contractually obligated to supervise." TPE's supervision of the installation was obviously deficient.

(Doc. 78-2, at 10).

Second, plaintiff's claim of negligence based on inadequate instructions fails, in defendant's telling, because Stanley failed to follow instructions that were independently adequate. (Docs. 74, at 10-15; 83, at 6-8). Further, defendant alleges plaintiff has not shown any inadequacy in the instructions led to the System collapse. (Doc. 74, at 15-17). Third, defendant argues plaintiff's negligent installation claim fails because the claim arises in contract, not tort. (Docs. 74, at 17-21; 83, at 8-11). Further, there was no duty to supervise the installation, despite contractual language providing for "cages, equipment, and supervision of installation" and a separate provision providing for a technician employed by defendant to supervise because supervision does not mean controlling, overseeing, and directing how the installation would occur. (Docs. 74, at 17-21; 78-3, at 60-61). Finally, defendant argues economic loss doctrine bars plaintiff's negligence claim because the collapse and resulting losses were foreseeable at the time of contract formation, and only economic losses occurred. (Docs. 74, at 22-24; 83, at 12-14).

Plaintiff asserts there is evidence that an alternative design would have produced a safer product, though the evidence has only recently come to light. (Doc. 84, at 10-11). Plaintiff appears to argue the alternative design simply would have been correct

assembly of the System. (*Id.*, at 11-12). Plaintiff further asserts that the assembly was inadequate because assembly relied on inadequate instructions containing contradictory depictions and instructions, making it foreseeable the System would also be inadequate, and such reliance on the instructions caused the collapse. (*Id.*, at 11, 12-13). Also, knowing the instructions were inadequate, plaintiff states that it paid extra and contracted with defendant to have defendant's employee supervise the assembly, which the technician negligently performed, resulting in unforeseeable losses. (*Id.*, at 13-17). Finally, plaintiff asserts economic loss theory does not preclude recovery from negligence, as plaintiff's requested relief is beyond just the product, and all factors point toward a tort remedy for the unforeseeable collapse. (*Id.*, at 17-22).

The Court finds that plaintiff has shown a genuine issue of material fact on Count III that precludes the Court from granting summary judgment.

As a preliminary matter, the Court must address the parties' arguments regarding economic loss doctrine and bringing these negligence claims. This rule provides that a contracting party who suffers losses purely economic in nature must seek its remedy in contract, not tort, and a plaintiff may recover in tort only for those damages that result from injury to his person or damage to its property. *Dannix Painting, LLC v. Sherwin-Williams Co.*, 732 F.3d 902, 905-06 (8th Cir. 2013); *Van Sickle Const. Co. v. Wachovia Commercial Mortg., Inc.*, 783 N.W.2d 684, 692-93 (Iowa 2010); *Determan v. Johnson*, 613 N.W.2d 259, 261-262, 263 (Iowa 2000) ("Tort theory . . . is generally appropriate when the harm is a sudden or dangerous occurrence, frequently involving some violence or collision with external objects, resulting from a genuine hazard in the nature of the product defect."). Iowa courts examine the type of defect, the type of risk, and the manner in which the damage or injury occurred. *Determan*, 613 N.W.2d at 262.

Here, the alleged defect was an installation defect of sorts—parts were missing because those responsible for installation did not follow all instructions. Parts collided

23

that should never have made contact as a result of the incorrect installation. This is not a case where there is merely a breach of some contractual duty; plaintiff's injury goes beyond the contract and beyond the pause and suffering placed upon plaintiff's source of business and revenue. *See Am. Fire and Cas. Co. v. Ford Motor. Co.*, 588 N.W.2d 437, 438, 439-440 (Iowa 1999) (discussing the distinction between "disappointed consumers" and "endangered" consumers). The economic loss here is merely a subset of damages as a result of the collapse. Not only did the System suddenly collapse as a result of improper installation, but it resulted in property damage. The collapse resulted in the loss of chickens and damage to the barn itself, and the barn and chickens were the tangible property to which plaintiff had a possessory, ownership interest. A human being also lost his life due to the collapse. Though the Court does not rely on this fact, it helps to mention it when explaining the high degree of danger that resulted from the installation errors that caused the collapse. Had others been in the barn, there may have been more killed or seriously injured. Rather than being a case of a disappointed consumer, plaintiff was an endangered purchaser. Simply put, the rule does not apply here and does not prevent the Court from considering plaintiff's negligence claims on summary judgment.

### 1. Negligence in Defective Design

#### a. Applicable Law

In *Wright*, the Iowa Supreme Court responded to certified questions posed by the United States District Court for the Northern District of Iowa on the issue of whether design defect claims should be raised as both strict liability and negligence claims. 652 N.W.2d, at 163. In response, the Iowa Supreme Court stated:

> We question the need for or usefulness of *any* traditional doctrinal label in design defect cases because . . . a court should not submit both a negligence claim and a strict liability claim. . . . Therefore, we prefer to label a claim based on defective product design as a design defect claim without reference to strict liability or negligence.

24

*Id.*, at 169 (emphasis in original). Iowa courts do not distinguish between strict liability design defect claims and negligent design defect claims. Thus, a design is defective when:

> the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the alternative design renders the product not reasonably safe[.]

*Wright*, 652 N.W.2d at 168; RESTATEMENT (THIRD) OF TORTS: PRODUCT LIABILITY § 2(b) (AM. L. INST. 1998). Thus, to prove a defective design claim sounding in negligence, a plaintiff must ordinarily show that (1) a reasonable alternative design exists, and that (2) the alternative design would have—at a reasonable design cost—reduced the foreseeability of harm posed by the product. *Mauer v. Icon Health and Fitness, Inc.*, No. C18-2009-LTS, 2020 WL 1052521, at *5 (N.D. Iowa Mar. 4, 2020).

### b. The Existence of a Reasonable Alternative Design

The Court finds that plaintiff failed to show a reasonable alternative design, because plaintiff failed to show an alternative design.

As a preliminary matter, the Court rejects defendant's argument that plaintiff disclaimed its design defect claims. Defendant refers to plaintiff's Interrogatory No. 12 to argue plaintiff disclaimed design defect claims, though plaintiff states it did not then have information available to it that it does now, which changes its answer. (Docs. 83, at 5; 84., at 10). It is true that plaintiff did not amend its discovery responses to assert a claim for design defect after disclaiming one, but it had asserted a negligent design defect in its complaint, which requires showing some alternative design. (Doc. 71-2, a 20).

As defendant notes, however, plaintiff has not proposed a reasonable alternative design at all and thus cannot satisfy this element. (Doc. 83, at 5). Defendant states any proposed design change is to the design or direction of the installation instructions. (Doc.

83, at 5). Further, defendant states any argument that plaintiff made about the instructions being unclear do not suggest a defect in design. The Court finds that these facts together satisfy defendant's burden.

Plaintiff fails to show a genuine dispute of material fact on the existence of an alternative design, let alone on the element of reasonable alternative design. Plaintiff argues that because of the depositions of Paolo Tarquini and Luca Tesser stating that some of the self-tapping screws were unnecessary, a reasonable alternative design would be for the manual to state two methods of acceptable on-site assembly. (Docs. 78-4, at 141-207; 84, at 11-12). Plaintiff states, "Paolo Tarquini and Luca Tesser stated during their depositions that the self-tapping screws at the top of the knuckle bracket were unnecessary, which is contradicted with TPE's and Childress' own testing via the input data to the SAP2000 model." (Doc. 84, at 11). Plaintiff continues on to say that a reasonable alternative design would be to alter the instructions to include what it calls the "two acceptable methods of assembly," provide what each method of assembly requires, consistently show where each piece must be installed, which parts must be installed, and lastly, how close the rail splice must be to the vertical stanchion. (*Id.*, at 11-12). This proposal, again, is not a proposal to change the product's design. This is the same as proposing to change the instructions and thus the *installation* process. If plaintiff were to show an alternative design of a product, it would need to offer an actual design of the *product* as created in the factory, not a change to installation or on-site, post-manufacturing instructions.

The Court need not opine as to whether such a suggestion is reasonable because suggesting an alternative installation instruction does not propose a design at all; that simply proposes an alternative instruction for a pre-manufactured item that later must be installed using said instructions.

For these reasons, then, the Court finds that plaintiff failed to show any evidence of a reasonable alternative design. This failure would be sufficient grounds to grant summary judgment in favor of defendant.

### c. Can Plaintiff Show a Reduction in Foreseeability

Defendant does not directly address the issue of foreseeability reduction in the context of a design defect. Instead, defendant acknowledges the need to address this element in its briefing, yet it chooses to argue that both elements of design defect fail because plaintiff has not alleged an alternative design under the first element. (Doc. 74, at 9-10). Because plaintiff failed to show any reasonable design, however, the Court need not analyze the foreseeability of any design. For these reasons, then, the Court finds that plaintiff is not entitled to relief under a theory of negligent design.

### 2. Negligence in Inadequate Instructions

### a. Applicable Law

Under both the Products Restatement and Iowa law, a failure to warn or adequately instruct claim is a negligence claim. RESTATEMENT (THIRD) OF TORTS: PRODUCT LIABILITY § 2(c) (AM. L. INST. 1998); *Wright*, 652 N.W.2d at 168. Section 2(c) provides that inadequate instructions render a product defective "when the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions . . . by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the instructions . . . renders the product not reasonably safe." *Id.*; *Mauer*, 2020 WL 1052521 at *4. Thus, a plaintiff must show that (1) "the foreseeable risk of harm could have been reduced or avoided with reasonable instructions" and (2) the risk was not obvious to product users. *Mauer*, 2020 WL 1052521 at *4. "Factors to consider when assessing the adequacy of instructions or warnings are content and comprehensibility, intensity of expression, and the characteristics of expected user groups." *Rock v. Smith*, 985 F.Supp. 2d 1066, 1072

27

Case 5:21-cv-04007-CJW-MAR   Document 88   Filed 11/08/22   Page 27 of 33

(S.D. Iowa 2013) (citation omitted). "Instructions inform persons how to use and consume products safely. Warnings alert users and consumers to the existence and nature of product risks so that they can prevent harm either by appropriate conduct during use or consumption or by choosing not to use or consume." RESTATEMENT (THIRD) OF TORTS: PRODUCT LIABILITY § 2 cmt. i (AM. L. INST. 1998).

### b. Reducing or Avoiding the Foreseeable Risk of Harm with Reasonable Instructions

Defendant points to the instructions as they are and states plaintiff's own expert establishes that the instructions are clear and argues that plaintiff has not pointed to evidence rebutting that fact. (Docs. 71, at 3; 71-1, at 10, 11, 12). In support, it states that Childress notes that the manual "clearly shows" where the fasteners are placed, and that the splices are to go near the vertical stanchion, indicating the instructions are already clear and do not produce harm. (Doc. 74, at 11-12). Defendant points further to Childress' opinion that Stanley did not follow instructions on how to build the catwalk, and that deviation from the instructions is the actual cause of the collapse, not any foreseeable harm from the instructions. (*Id.*, at 14). But these arguments all appear directed at the quality of the instructions, not how a different instruction would have reduced the foreseeability of harm.

Here, plaintiff states only that the instructions were defective because they were unclear and conflicting. (Doc. 84, at 12-13). Elsewhere throughout its briefing, plaintiff points to its proposed change to the manual instructions, which would provide "two acceptable methods of assembly," provide what each method of assembly requires, consistently show where each piece must be installed, which parts must be installed, and lastly, how close the rail splice must be to the vertical stanchion. (Doc. 84, at 11-12). It states that because the instructions did not do this, the instructions were defective, and it was highly foreseeable that the System would be improperly assembled. (*Id.*, at 11).

28

Plaintiff has not, however, provided any facts or evidence, including an expert opinion to this effect, to show how this change would have reduced the foreseeability of harm. There is much complexity to this kind of instruction manual and to engineering and structural integrity implications that an average juror would not understand without an expert explanation of the reduction of harm. Such explanation is helpful, though not required, to show any genuine issue. *See Neilson v. Whirlpool Corp.*, No. 3:10-cv-00140-JAJ-RAW, 2012 WL 13018693, at *11 (S.D. Iowa Jan. 3, 2012) (acknowledging the complexity and confusion for an average juror when complicated instructions are involved without expert explanation); *Rock*, 985 F.Supp. 2d at 1072-73 (stating that although Iowa law does not tautologically require an expert to testify whether in claims for inadequate instructions, such testimony is required to show causation jurors require expert explanation "to reach an intelligent decision about whether the foreseeable risks of harm posed by [a product] could have been reduced or avoided by the provision of reasonable instructions or warnings and, if so, whether an omission of instructions or warnings rendered the device not reasonably safe."). Thus, there is no evidence here to create a genuine issue of material fact on this element.

### c. Can Plaintiff Show the Risk was not Obvious

Here, defendant claims the risk was not a result of the instructions but from the lack of following them, and such deviation would create an obvious risk. (Doc. 83, at 6-7). Further, it states plaintiff has not shown any evidence that the instructions were the cause of the risk of harm. (*Id.*, at 7-8). It points to the fact plaintiff must, but has not, offered evidence that shows unclear instructions existed or that those instructions then impacted the way Stanley conducted the installation. (*Id.*, at 7).

Plaintiff does not show how there was a nonobvious risk of harm from the instructions provided with the System. It claims the instructions are defective, conflicting, and unclear, but it never states or points to facts that indicate a nonobvious

risk of harm caused by the instructions it claims are defective. It would be generous for the Court to interpret part of plaintiff's economic loss argument as meaning that the risk from the alleged defective instructions carried a nonobvious risk of harm. (Doc. 84, at 21). Plaintiff has not cited any evidence that the risk from the defect in instructions—whatever it is—was not obvious.

Thus, there is no genuine issue of material fact that entitles plaintiff to judgment in its favor for its claimed negligent failure to warn through inadequate instructions.

### 3. *Negligent Supervision*

The Court, however, **denies** defendant's motion for summary judgment as it pertains to plaintiff's negligent-supervision claim.

#### a. *Applicable Law*

A plaintiff may allege an employer was negligent in failing to properly supervise an employee who caused the injury. A cause of action based on negligent supervision "allows an injured party to recover where the employee's conduct is outside the scope of employment, because the employer's own wrongful conduct has facilitated in some manner the tortious acts or wrongful conduct of the employee." *Kiesau v. Bantz*, 686 N.W.2d 164, 172 (Iowa 2004). To prevail on a claim of negligent supervision, plaintiff must show:

> (1) the employer knew, or in the exercise of ordinary care should have known, of its employee's unfitness at the time the employee engaged in wrongful or tortious conduct;
> (2) through the negligent . . . supervision of the employee, the employee's incompetence, unfitness, or dangerous characteristics proximately caused injuries to the plaintiff; and
> (3) there is some employment or agency relationship between the employee and the defendant employer.

Case 5:21-cv-04007-CJW-MAR   Document 88   Filed 11/08/22   Page 30 of 33

*Est. of Harris v. Papa John's Pizza*, 679 N.W.2d 673, 680 (Iowa 2004); *Shearer v. Hirschbach Motor Lines, Inc.*, No. 214-CV-1014 CJW-MAR, 2022 WL 2317443, at *20 (N.D. Iowa June 28, 2022).

### b. Knowledge of the Employee's Unfitness at the Time the Employee Engaged in Wrongful or Tortious Conduct

Neither party appears to argue on the element involving defendant's knowledge of the technician's lack of fitness, so defendant cannot be said to meet its burden here.

The technician's deposition revealed that he was not aware of the tasks he was to perform at the installation. (Doc. 78-4, at 41-95). He had not seen the contract before. (Doc 78-4, at 41-43, 61-62). He had only been trained by other installers who showed him how they put the system together, and he said there was not a standard installation method, though they were "similar." (Doc. 78-4, at 36-38). Defendant also would know that the technician had never supervised the installation of this product before and only believed he was to check the pieces of the product as they were delivered. (Doc. 78-4, at 38-39). Further, defendant never gave instructions, checklists, documents or reports for the technician to check or submit. (Doc. 78-4, at 61-61). All of these things were details the technician arguably would need to know to perform his job appropriately and within the proper scope, yet he knew none of them. *See Metro. Prop. and Cas. Ins. Co. v. Agency One Ins., Inc.*, 6 F. Supp. 3d 906, 915 (N.D. Iowa 2014). A reasonable jury could find that defendant knew or should have known that the technician was not fit to assemble the System at the time of the installation. For these reasons, plaintiff shows a genuine dispute of material fact on this element of the negligent-supervision claim.

### c. Causation

To satisfy causation, plaintiff must show that "through the negligent . . . supervision of the employee, the employee's incompetence, unfitness, or dangerous

characteristics proximately caused injuries to the plaintiff[.]" *Est. of Harris*, 679 N.W.2d at 680.

Defendant only asserts that its contract cannot give rise to a duty for purposes of negligence because providing supervision for installation is not an undertaking to provide services necessary to protect plaintiff's person or things. (Doc. 83, at 11). This argument is not responsive. Defendant, thus, has not provided evidence that if uncontroverted at trial would entitle it to a judgment that defendant's lack of proper direction and supervision of the technician or his incompetence or unfitness did not cause the collapse.

Evidence in the record further supports causation. The product was contracted for, but the contract also included installation of the System, which may have created a duty to provide services necessary to protect persons or things associated with building or use of the product. (Doc. 84, at 13-14). Further, there is a genuine dispute as to whether the technician contributed to the collapse by not instructing Stanley to follow the instruction manual—a job the technician was tasked with by his employer, defendant. (Docs. 78-3, at 12; 78-4, at 31-95). The technician stated in his deposition that he was not aware of the tasks he was supposed to perform at the relevant installation, meaning he may have lacked fitness and competence in the specific job to be performed, as would any other person lacking all the facts. (Doc. 78-4, at 41-95). The technician also did not believe "supervision" was his specific task, disputed the word's use despite its place in the contract, and was unsure whether defendant had different kinds of installation techniques for the System. (Doc. 78-4, at 37-38, 38-43). Plaintiff believed supervision meant directing the build and informing the installers—all employed by Stanley—of what each step of installation entailed, and plaintiff thought that this was also defendant's understanding of the agreement. (Docs. 84, at 4; 87).

### d. Can Plaintiff Show Employment or an Agency Relationship

Defendant never directly addresses this element in its original briefing (Doc. 74) or its reply (Doc. 83). Likewise, defendant does not acknowledge in its briefing on this element that its company supervised the build via a technician. (Doc. 71-3, at 286, 300).

It does not matter on this element that Stanley is not affiliated with defendant; defendant sent a technician-employee as contracted to the site to supervise Stanley in some way during the installation. (Doc. 78-4, at 33, 36-43). Whether defendant's employee did so or did so negligently bears directly on whether defendant is liable for negligent supervision of the technician leading to an incorrect build and collapse, regardless of whether its actor or employee was supervising a subcontractor or independent installer. Defendant has not contested that it employed the technician at this time. (Doc. 78-4, at 34, 36, 39). Defendant has not met its burden here because it has not provided evidence on the issue or provided evidence negating the material facts plaintiff has alleged.

Defendant has not met its burden on any element of the claim for negligent supervision, and thus, Count III cannot be dismissed at this stage. Thus, because there is a genuine issue of material fact on the issue of negligent supervision for which a jury could find for plaintiff, the Court denies defendant's motion to dismiss Count III.

## IV. CONCLUSION

For these reasons, defendant's motion for summary judgment (Doc. 71) is **granted** as to plaintiff's claims for strict products liability (Count I) and breach of implied warranties (Count II) but is **denied** as to plaintiff's claim of negligence (Count III).

**IT IS SO ORDERED** this 8th day of November, 2022.

_____
C.J. Williams
United States District Judge
Northern District of Iowa

33